UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| N.D. SHIPPING, S.A., ET AL. | CIVIL ACTION |
| VERSUS | NO. 06-10734 |
| ZAGORA M/V, ET AL. | SECTION "L" (3) |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

### I. PROCEDURAL HISTORY

This case arises out of an allision between two Panamax-sized bulk ships in an area of the lower Mississippi River known as the Lower Kenner Bend.[1] On October 16, 2006, at approximately 1455 local time, the M/V ZAGORA, a vessel owned by Sea Powerful, S.A., and operated by Goulandris Brothers (Hellas) Ltd. (collectively, "the ZAGORA," or "Defendants"), allided with the TORM ANHOLT, a vessel owned by N.D. Shipping, S.A., and operated by Dia Marine Corporation and Mitsubishi Ore Transport Co. (collectively, "the TORM ANHOLT," or "Plaintiffs"). At the time of the allision, the ZAGORA was proceeding down river and the TORM ANHOLT was stationary, with its anchor in the Lower Kenner Bend Anchorage and its stern tailing out beyond the boundaries of the anchorage. On December 1, 2006, the TORM ANHOLT interests filed suit in this Court against the ZAGORA interests. On January 16, 2007, the ZAGORA interests filed a counterclaim, seeking compensation for damages to the M/V

---

[1] "An allision is a collision between a moving vessel and a stationary object." THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW, § 14-2 (4th ed. 2004).

ZAGORA.

This case involves the interrelationship between two rebuttable presumptions in admiralty law not ordinarily found in state tort law, specifically the *Oregon* rule and the *Pennsylvania* rule. The TORM ANHOLT urges the Court to invoke *the Oregon* rule and apply a rebuttable presumption that the ZAGORA was at fault for alliding with a stationary object. On the other hand, the ZAGORA urges the Court to invoke the *Pennsylvania* rule and apply a rebuttable presumption that the TORM ANHOLT's location outside the statutorily-defined boundaries of the Lower Kenner Bend Anchorage was the sole proximate cause of the allision.

This matter was tried before the Court without a jury. After considering the testimony of the witnesses, the exhibits admitted into evidence, and the briefs submitted by the parties, the Court now makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52 (a) of the Federal Rules of Civil Procedure. To the extent that a finding of fact constitutes a conclusion of law, the Court adopts it as such. Likewise, to the extent that a conclusion of law constitutes a finding of fact, the Court also adopts that as such.

## II. FINDINGS OF FACT

1.

On October 15th, 2006, at approximately 2150, the M/V TORM ANHOLT, a modern seven-hatch bulk carrier, anchored in the Lower Kenner Bend Anchorage under the guidance of Baton Rouge Pilot E.J. Doyle, Sr. The TORM ANHOLT is a "Panamax" size ship, approximately 740 feet long and 105 feet in width. At the time that it anchored in the Lower Kenner Bend, the TORM ANHOLT was empty of cargo and "in ballast," as it was preparing to load grain from the ADM Reserve.

2.

The Kenner Bend area of the Mississippi River is aligned in an east-west direction, so vessels heading upriver proceed in a westerly direction, and vessels heading downriver proceed in an easterly direction. The Kenner Bend and Lower Kenner Bend Anchorages are commonly used for empty grain or coal ships awaiting loading berths farther up the river.

3.

At the time of the allision, the Mississippi River was at a low stage, measuring 4.17 feet on the Carrollton gauge, with a current of approximately two knots. Weather conditions were clear with good visibility and a stiff southerly wind.

4.

The allision occurred between mile markers 113.3 and 114.3 AHP, in an area of the Lower Kenner Bend Anchorage that lies directly across the river from the north-south runway of the New Orleans International Airport.

5.

The width of the Lower Kenner Bend area of the Mississippi River varies from approximately 2400 feet at the lower end to approximately 3000 feet at the upper end. In the area where the TORM ANHOLT had anchored, the bank-to-bank distance of the river is approximately 2400 feet.

6.

The Lower Kenner Bend Anchorage is 350 feet in width, and its landward boundary starts 350 feet from the nearest river bank on the west bank. The Code of Federal Regulations, 33 C.F.R. § 110.195(a)(19), designates the anchorage for the Lower Kenner Bend as follows:

> Lower Kenner Bend Anchorage. An area 1.0 miles in length along the right descending bank of the river extending from mile 113.3 to mile 114.3 above Head

of Passes. The width of the anchorage is 350 feet. The inner boundary of the anchorage is a line parallel to the nearest bank 350 feet from the water's edge into the river as measured from the LWRP. The outer boundary of the anchorage is a line parallel to the nearest bank 700 feet from the water's edge into the river as measured from the LWRP.

See 33 C.F.R § 110.195(c)(19). The Code of Federal Regulations further indicates that "[a]nchoring in the Mississippi River below Baton Rouge, LA ... is prohibited outside of established anchorages except in cases of emergency." 33 C.F.R. § 110.195(c)(1).

7.

The Tulane ARTCO Barge Fleet occupies the first 350 feet inside the anchorage, resulting in a 350-foot wide anchorage with an outward boundary terminating 700 feet from shore. As a result, ships anchoring in the Lower Kenner Bend risk making contact with the barge fleet if they swing towards the shore in a strong wind. Indeed, if one were to anchor a 740-foot long, 105-foot wide Panamax ship exactly in the middle of the Lower Kenner Bend Anchorage, it would leave only approximately 122.5 feet on each side of the ship, between the barge fleet on the west side and the anchorage limit on the east side. Under a strong crosswind, such a vessel would likely either blow directly into the barge fleet or tail out into the river.

8.

The prevailing winds at the Kenner Bend Anchorage during the summer and fall months tend to be either out of the south ("southerly wind") or out of the north during rainstorms and squalls ("northerly wind"). At the lower Kenner Bend Anchorage, which is aligned in an east-west direction, these crosswinds are perpendicular to the banks of the river. It is well known that, in a strong cross-river wind, empty vessels that are anchored in the Lower Kenner Bend Anchorage tend to "tail out" or "weathervane" into the river.

9.

The TORM ANHOLT was anchored within the limits of the Lower Kenner Bend Anchorage. Upon anchoring, the TORM ANHOLT had three shackles or "shots" of chain out (a shot is 90 feet), so the anchors would be 270 feet forward in front of the ship. Given the charts and evidence admitted at trial, as well as the witnesses' testimony regarding the position of the vessels at the time of the allision, this puts the TORM ANHOLT's anchors within the statutorily-defined anchorage limits.

10.

At the time of the allision, however, the TORM ANHOLT, as well as the three ships anchored immediately upriver from her in the Lower Kenner Bend Anchorage, including the ONEGO EXPLORER, the C IRIS, and the AMY C, were all tailing out in to the river. That is to say, her anchor was within the defined boundaries of the anchorage but her stern had tailed out beyond the anchorage's boundaries. The fact that the other ships were tailing out into the river is clearly visible in the U.S. Coast Guard's aerial photograph taken immediately after the allision. *See* Exhibit 21.

11.

Three other empty ships anchored in the Kenner Bend Anchorage, including the CHIOS CHARITY, the REINAUER, and the OKHOTSK, were also tailing out in the river. The same crosswinds that will swing a ship's stern out into the river when blowing from the south will also swing the ship's stern in towards the barge fleet when blowing from the north. As a result, the TORM ANHOLT would have been somewhat at risk of colliding with the ARTCO Barge Fleet if it had been anchored closer to the shore.

12.

Although the TORM ANHOLT had been tailing out into the river, the vessel's position left approximately 900-1000 feet of navigable channel between her stern and the east bank.

13.

From the evening of October 15th until the time of the allision on October 16th, numerous ships and barge tows passed the TORM ANHOLT and the other vessels anchored at Lower Kenner Bend. None of these ships expressed any concern as to the TORM ANHOLT's position or indicated any trouble in safely navigating the river.

14.

During the time that the TORM ANHOLT was tailing out into the river, it did not hold its engines on standby.

15.

Vessels in the Kenner Bend area are required to stand by on VHF Channel 67 because VTS New Orleans monitors and works on VHF channel 67. *See* 33 C.F.R. §§ 26.03(e), 26.04(d), (e). The TORM ANHOLT's bridge anchor watch was not monitoring Channel 67, but was instead standing by on channels 16 and 68 or 13. Although Channels 68 and 13 are not used for bridge-to-bridge communications or traffic safety of the Mississippi River, in the event of an emergency the Coast Guard could have contacted the TORM ANHOLT on Channel 16.

16.

At approximately 1425 on October 16, 2006, the M/V ZAGORA, carrying a load of soybeans, was proceeding downriver under the guidance of Pilot Donald Clement, Jr. The ZAGORA is a "Panamax" size ship, approximately 740 feet long and 105 feet in width.

17.

As the ZAGORA began to nagivate the Fairview Crossing, which is upriver from the Lower Kenner Bend Anchorage, the ZAGORA's engine room received an alarm indicating that the No.1 cylinder for the main engine had a high temperature alarm in the scavenge air space for that cylinder. The alarm showed an elevated temperature of 101ºC, which printed out on ZAGORA's engine room alarm tape.

18.

High temperatures in a vessel's scavenge air space can lead to a number of problems, including, but not limited to, explosions in the crankcase, engine casualty, or fire. Other possible effects include "automatic slowdown" of the engine, which is an involuntary reduction of the engine to dead slow or slow ahead and can seriously impede maneuverability under certain circumstances.

19.

The ZAGORA's Chief Engineer interpreted the high-temperature alarm as a "false alarm" because no high temperatures were noted in the engine itself. Although the Chief Engineer was uncertain as to what caused the alarm, he chose not to report the alarm to Pilot Clement or anyone on the bridge crew.

20.

Pilot Clement testified that he should have been advised of the high temperature alarm. Such an alarm, even if it is a false alarm, can cause an automatic shutdown or loss of power in the engines. If Pilot Clement had known about the alarm, he might have slowed the ZAGORA down, dropped anchors, or called for assist tugs to aid in navigating the Lower Kenner Bend. Instead, Pilot Clement, unaware of the alarm, pushed the ZAGORA to full ahead sea speed as the

vessel approached the Lower Kenner Bend.

21.

Immediately before the allision, at approximately 1450, the ZAGORA was beginning to navigate the Lower Kenner Bend when it experienced a second high-temperature alarm. Whereas the previous alarm had registered only 101ºC, the second high-temperature alarm registered 123ºC. This is significant because any high-temperature alarm over 120ºC will trigger an automatic engine slowdown, and the second alarm did indeed cause a shutdown of the ZAGORA's engine.

22.

At the time of the engine shutdown, the ZAGORA, proceeding at full ahead sea speed, or approximately 11 knots, had been navigating a gentle starboard turn in the river. When its engine suddenly failed, the ZAGORA began to swing sharply off to starboard as it entered the Lower Kenner Bend area of the Mississippi River.

23.

In an attempt to remedy the ship's starboard swing, Pilot Clement ordered the ship to turn hard to the port side. When it became clear that the port-side turn had little to no effect on the ZAGORA's course, Pilot Clement then announced the situation on VHF-FM Channel 67 and sounded the whistle in order to alert the nearby ships of the ZAGORA's malfunction. The master then ordered the port anchor dropped, but the chain ran out and the windlass brake did not hold.

24.

The ZAGORA began to regain engine power shortly before the allision. As Pilot Clement testified, however, it was "too little, too late," and the ZAGORA was unable to avoid

the allision.

25.

At approximately 1455, the bow of the ZAGORA made direct contact with the No. 7 hold area of the TORM ANHOLT. After the ships separated, the ZAGORA continued downriver, dropped her starboard anchor, and then swung around, coming to a complete stop in an anchored position just below the TORM ANHOLT. The photograph taken by the Coast Guard depicts the position of the vessels in the wake of the collision.

26.

Pilot Clement testified that, despite the TORM ANHOLT's tailing into the river, he would not have had any difficulty passing the vessel if the ZAGORA's engine had not failed. According to Pilot Clement, the approximately 900 feet between the TORM ANHOLT and the opposite shore left more than enough room for two Panamax vessels to pass one another.

27.

On October 17, 2006, having suffered considerable damage from the allision, the TORM ANHOLT was brought slightly closer to the shore. On October 18, however, the southerly wind shifted to the north, swinging the TORM ANHOLT directly into the barge fleet. After making contact with the barge fleet, the TORM ANHOLT had to summon a tug and seek Coast Guard permission to proceed back out into the river to the same area where she had initially anchored. The TORM ANHOLT eventually proceeded from New Orleans to the Grand Bahamas Shipyard for permanent repairs.

28.

The parties have stipulated to the following amounts of damages: (1) $4,280,229.06 in damages to the TORM ANHOLT; and (2) $1,201,301.15 in damages to the ZAGORA.

# III. CONCLUSIONS OF LAW

1.

This case arises under the Court's admiralty and maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. In addition, the Court also has jurisdiction pursuant to 28 U.S.C. § 1333. Venue is proper in the Eastern District of Louisiana.

2.

To establish a negligence claim under admiralty law, the plaintiff must show (1) there was a duty owed to plaintiff by the defendant; (2) the defendant breached that duty; and (3) the breach caused the plaintiff's alleged injuries. *In Re Mid-S. Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005).

3.

Admiralty law imposes a duty of care on vessel owners and operators to operate their vessels under the "rule of good seamanship" and in a safe and seaworthy manner. *See* SCHOENBAUM, ADMIRALTY AND MARITIME LAW 760-64; 33 U.S.C. § 20082(c). Therefore, the outcome determinative factors in the instant case are: "(1) breach of the duty of care ... and (2) causation, with causation having sub-elements of: (a) cause in fact and (b) proximate or legal cause." *In Re Mid-S. Towing Co.*, 418 F.3d at 531.

4.

"Liability for collisions on the navigable waters is governed by a series of presumptions and burden-shifting principles." *Illinois Constructors Corp. v. Logan Transp., Inc.*, 715 F. Supp. 2d 872, 879 (N.D. Ill. 1989). The first such presumption applicable to this case is that, when a plaintiff owns a stationary object that is hit by a moving vessel, the plaintiff can satisfy its initial burden of showing negligence or fault on the part of the defendant by invoking the *Oregon* rule,

which provides that a moving vessel that allides with a stationary object is deemed to be presumptively at fault for the allision. *The Oregon*, 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943 (1895). The *Oregon* rule derives from "the common-sense observation that moving vessels do not usually collide with stationary objects unless the [moving] vessel is mishandled in some way." *Folkstone Maritime Ltd. v. CSX Corp.*, 64 F.3d 1037, 1046 (7th Cir. 1995). The *Oregon* rule does not, however, permit a plaintiff to avoid proving the general elements of negligence; "rather, it merely satisfies the plaintiff's *prima facie* case." *City of Chicago v. M/V Morgan*, 375 F.3d 563, 572 (7th Cir. 2004) (citing *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724, 726 (5th Cir. 1967)). "If a defendant comes forward with evidence to rebut the presumption, a court must consider such evidence." *Vinson v. Cobb*, 501 F. Supp. 2d 1125, 1132 (E.D. Tenn. 2007).

5.

Turning to the instant case, the Court finds that the application of the *Oregon* rule is appropriate. The ZAGORA breached its duty of care under admiralty law by negligently alliding with the TORM ANHOLT when the TORM ANHOLT was stationary and anchored in the Lower Kenner Bend area of the Mississippi River.[2] Even apart from the presumption set forth in the *Oregon* rule, though, the Court finds that the ZAGORA was negligent and breached its duty of care. The ZAGORA's engineers received notice of a significant high-temperature alarm but failed to notify the bridge crew of the alarm. As a result, the bridge crew, unaware of the alarm, entered the narrow Lower Kenner Bend area of the Mississippi River at full ahead sea speed and without the aid of any assist tugs. When the ZAGORA subsequently experienced a

---

[2] The Court notes, however, that the *Oregon* rule does not relieve the Plaintiff of the burden of demonstrating *causation*. *See In Re Mid-S. Towing Co.*, 418 F.3d at 531, n. 5.

second high-temperature alarm, the vessel lost maneuverability and spun out of control to the starboard side, eventually alliding with the anchored TORM ANHOLT.

6.

The second rebuttable presumption applicable to this case is the *Pennsylvania* rule. Whereas the *Oregon* rule deals with *fault*, the *Pennsylvania* rule deals with *causation*.[3] The ZAGORA urges the Court to apply the *Pennsylvania* rule and find that, despite the ZAGORA's fault, the TORM ANHOLT's position outside the Lower Kenner Bend Anchorage was the sole proximate *cause* of the allision.

7.

Under the *Pennsylvania* rule, a party that violates a statutory or regulatory rule designed

---

[3]In *In Re Mid-South Towing Co.*, the Fifth Circuit provided a thorough analysis of the relationship between the *Oregon* rule and the *Pennsylvania* rule:

> It is important to distinguish ... between the presumption of fault announced in *The Oregon* and the presumption of causation announced in *The Pennsylvania*; the latter case holding that a vessel in violation of a statutory rule designed to prevent collisions bears the burden of showing 'not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.' *The Pennsylvania*, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1873). *Compare* SCHENBAUM, ADMIRALTY & MAIRTIME LAW § 14-3, at 104-05 (classifying the rule of *The Oregon* as a 'presumption of fault' akin to the common law doctrine of *res ipsa loquitor* 'primarily applicable in allision cases,' which creat[es] a rebuttable presumption of *negligence* on the part of a party who is in exclusive control of an instrumentality with regard to a mishap that ordinarily does not occur in the absence of negligence' (emphasis added) *with id.* at § 14-3, at 101 (classifying the rule of *The Pennsylvania* as not establishing a rule of fault but as being '*limited to causation*') (emphasis added), *and* DAVID W. ROBERTSON ET AL., ADMIRALTY & MARITIME LAW IN THE UNITED STATES 384 (2d ed. 2001) (describing the rule of *The Pennsylvania* as creating a strong presumption that the statutory violation was a cause in fact of the accident,' and distinguishing this rule from the common-law concept of negligence per se famously applied in *Martin v. Herzog*, 228 N.Y. 164, 126 N.E. 814 (1920) (Cardozo, J.)).

*In Re Mid-S. Towing Co.*, 418 F.3d at 531, n. 5.

to prevent collisions "has the burden of proving that its statutory fault was not a contributing cause of the accident." *Illinois Constructors Corp.*, 715 F. Supp. 2d at 879. As the Supreme Court has explained,

> When ... a [party] at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case, the burden rests upon the [party that violated the rule] of showing not merely that [its] fault might not have been one of the causes, or that it probably was not, but that it could not have been.

*The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874). The *Pennsylvania* rule cannot, however, "be pressed to such an extreme as to justify a division of damages when the accident was undoubtably due to the negligence of an offending vessel whose actions could not be anticipated." *See Dow Chem. Co. v. Dixie Carriers, Inc.*, 468 F.2d 120, 122 at n. 5 (5th Cir. 1972) (quoting *Webb v. Davis*, 236 F.2d 90, 93 (4th Cir. 1956)); *see also Am. River Trans. Co. v. Kavo Kaliakra SS*, 148 F.3d 446, 450 (5th Cir. 1998) (holding that the *Pennsylvania* rule does not compel a finding that the mere presence of unlicensed barges moored in the Mississippi River was a proximate cause of an allision where the alliding vessel's crew was aware of the location of the barges and failed to reduce the speed of their vessel after losing power).

8.

Given the facts of the instant case, the Court finds that the application of the *Pennsylvania* rule is appropriate. The TORM ANHOLT's position outside the statutorily-defined limits of the Lower Kenner Bend Anchorage was one of the proximate causes of the allision. Had the TORM ANHOLT been located squarely within the anchorage, the ZAGORA would likely have been able to regain power in time to avoid the allision altogether. Further, 33 C.F.R. § 164.19(c) states:

> Whenever weather, tide or current conditions are likely to cause the vessel's anchor

> to drag, action is taken to ensure the safety of the vessel, structures, and other vessels, such as being ready to veer chain, let go a second anchor or get underway using the vessel's own propulsion or tug assistance.

The TORM ANHOLT's engine was not on standby during the period in which the vessel was tailing out into the river. Had the TORM ANHOLT kept its engine on standby during that time, the vessel would have been able to return to a safe position within the limits of the Lower Kenner Bend Anchorage in time to avoid the allision. The Court notes, however, that even under the *Pennsylvania* rule, the TORM ANHOLT's statutory violations were not the sole proximate cause of the allision.

9.

Despite the above findings, it is important to note that rebuttable presumptions such as the *Oregon* rule and the *Pennsylvania* rule serve only to permit the trier of fact, "in the absence of other evidence, ... [to] have a solid, perhaps as a practical matter an unshakable, basis" to determine whether a party was negligent or whether the party's actions proximately caused an accident. *Rodi Yachts, Inc. v. National Marine, Inc.*, 984 F.2d 880, 887 (7th Cir. 1993). These presumptions, however, have limited applicability in the instant case because "there *is* other evidence." *Id.* (emphasis added). As the Fifth Circuit has explained, "[e]videntiary presumptions ... are designed to fill a factual vacuum. Once evidence is presented ... presumptions become superfluous because the parties have introduced evidence to dispel the mysteries that gave rise to the presumptions." *See In Re Mid-S. Towing Co.*, 418 F.3d at 531 (quoting *Rodi Yachts, Inc.*, 984 F.2d at 887). In this case, "the method of decision by presumptions" is somewhat less precise, because "each party is armed with a presumption .... [and] where presumptions clash, they disappear." *Id.* at 534, n. 15.

10.

Having reviewed the witnesses' testimony, the exhibits admitted into evidence, and the parties' briefing, the Court finds that, even in the absence of the above presumptions, the ZAGORA was negligent and its negligence–which led to the second high-temperature alarm and subsequent engine failure–was a proximate cause of the allision. After experiencing the second high-temperature alarm, the ZAGORA lost maneuverability and the bridge crew was unable to slow the vessel or right its course in time to avoid making direct impact with the TORM ANHOLT.

11.

The Court also finds, however, that the TORM ANHOLT's position outside of the statutorily-defined Lower Kenner Bend Anchorage at the time of the allision contributed to and was also a proximate cause of the accident. Had the TORM ANHOLT been located within the statutorily-defined boundaries of the Lower Kenner Bend Anchorage, the ZAGORA, despite its earlier negligence, would have been able to recover its engine power and maneuverability in time to avoid the allision altogether. Further, the TORM ANHOLT's position caused some obstruction to the navigable channel of the Lower Kenner Bend area, and it is no defense that it was customary for vessels to anchor in violation of the statute. Finally, had the TORM ANHOLT kept its engines on standby during the period in which it was tailing into the river, it would have been able to move out of the path of the ZAGORA in time to avoid the allision.

12.

In maritime tort cases where more than one party is responsible, courts apportion liability on the basis of fault according to the rules of comparative negligence. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 44 L.Ed.2 251 (1975); *Coats v. Penrod Drilling*

*Corp.*, 61 F.3d 1113, 1130 (5th Cir. 1995). The Fifth Circuit has made clear that the *Pennsylvania* rule "still floats, in the wake of *United States v. Reliable Transfer*, ... which only overruled *The Pennsylvania* on the point allocating comparative fault." *See Allied Chem. Corp. v. Hess Tankship Co. of Delaware*, 661 F.2d 1044, 1052 (5th Cir. 1981).

13.

As between the two vessels in this case, the Court finds that the ZAGORA bears the far greater apportionment of fault. The allision could have easily been prevented if the ZAGORA's engineer had simply notified the bridge crew of the initial high-temperature alarm. The crew was negligent in disregarding the alarm. Pilot Clement testified that he should have been notified of the alarm, and, if he had known of it, he likely would have anchored the vessel until the source of the alarm was determined. Pilot Clement also testified that, in the alternative, he might have summoned assist tugs to aid the ZAGORA in navigating the Lower Kenner Bend channel. At the very least, though, Pilot Clement would not have proceeded through the Lower Kenner Bend at full ahead sea speed and without the aid of any assist tugs. Further, after the ZAGORA lost power and maneuverability, the crew failed to take appropriate steps to timely resolve the problem prior to the allision.

14.

The Court also notes, however, that the TORM ANHOLT's position at least caused some obstruction to the waterway, and it is no defense that it is customary for vessels to violate the express terms of the statute that defines the boundaries of the anchorage. The ZAGORA had regained some of its engine power prior to the allision, and, had the TORM ANHOLT been located squarely within the statutorily-defined limits of the Lower Kenner Bend Anchorage or had its engines on standby, the ZAGORA would have been able to correct its course prior to the

allision. Given the point at which the ZAGORA made impact on the TORM ANHOLT, however, it is perhaps equally possible that, had the TORM ANHOLT been located closer to the west bank of the river, the ZAGORA would have simply allided with the TORM ANHOLT's engine room instead of its hold area, potentially resulting in far greater damage.

15.

In apportioning fault, the Court is also mindful of the fact that, during the entire time that the TORM ANHOLT was tailing out into the river, no vessels reported any difficulties with the TORM ANHOLT's position, or, for that matter, the position of any of the several other vessels tailing out into the river. Pilot Clement himself testified that, were it not for the ZAGORA's engine failure, he could have passed the TORM ANHOLT without any considerable difficulty.[4]

16.

Accordingly, the Court finds that the following apportionment of fault is appropriate: (1) the ZAGORA is 90% at fault for the allision; and (2) the TORM ANHOLT is 10% at fault for the allision.

17.

As stated above, the parties have stipulated to the following total damages: (1) $1,201,301.15 in damages to the ZAGORA; and (2) $4,280,229.06 in damages to the TORM ANHOLT.

---

[4] Indeed, several witnesses testified that, slightly upriver from the Lower Kenner Bend, there is a much narrower, 500-foot wide section of the Mississippi River where Panamax-size ships regularly pass one another without considerable difficulty.

## IV. PRE-JUDGMENT INTEREST

In admiralty cases, although an award of prejudgment interest is discretionary with the court, such interest is normally awarded unless specific circumstances are present that would make the award inequitable. *See Probo II London v. Isla Santay M/V*, 92 F.3d 361, 363-64 (5th Cir. 1996). The rate of prejudgment interest, as well as the date from which it accrues, is also discretionary with the court. *See* SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 5-21 (4th ed.). "The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss.... [P]rejudgment interest is not awarded as a penalty; it is merely an element of just compensation." *City of Milwaukee v. Cement Div., Nat. Gypsum Co.*, 515 U.S. 189, 195-97, 115 S.Ct. 2091, 2095, 132 L.Ed.2d 148 (1995). Prejudgment interest is appropriate in cases of mutual fault, and "denying prejudgment interest on the basis of mutual fault would seem to penalize a party twice for the same mistake. Such a double penalty is commended neither by logic nor by fairness...." *Id.* at 199 (citing *Alkmeon Naviera, S.A. v. M/V Marina L*, 633 F.2d 789. Given the facts of the instant case, the Court finds that an award of prejudgment interest at the rate of 5.5% per annum from the date of judicial demand is appropriate.

## V. SUMMARY

For the foregoing reasons, IT IS ORDERED that:

(1) The Plaintiffs (the TORM ANHOLT interests) shall be liable to the Defendants (the ZAGORA interests) for 10% of the ZAGORA's damages, plus prejudgment interest at the rate of 5.5% per annum from the date of judicial demand;

(2) The Defendants (the ZAGORA interests) shall be liable to the Plaintiffs, (the TORM

ANHOLT interests) for 90% of the TORM ANHOLT's damages, plus prejudgment interest at the rate of 5.5% per annum from the date of judicial demand.

New Orleans, Louisiana, this 5th day of June, 2009.

                                                               *Eldon E. Fallon*
                                                  UNITED STATES DISTRICT JUDGE